**Electronically Filed**
**Intermediate Court of Appeals**
**CAAP-18-0000478**
**08-JUN-2020**
**08:07 AM**

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI

---o0o---


STATE OF HAWAIʻI, Plaintiff-Appellee,
v.
SEAN WEBER, Defendant-Appellant


NO. CAAP-18-0000478


APPEAL FROM THE DISTRICT COURT OF THE THIRD CIRCUIT
(CASE NO. 3DTC-17-051847)


JUNE 8, 2020


GINOZA, CHIEF JUDGE, CHAN AND HIRAOKA, JJ.


OPINION OF THE COURT BY HIRAOKA, J.


After a bench trial, Defendant-Appellant Sean Weber
(**Weber**) was convicted by the District Court of the Third Circuit,
South Kohala Division, State of Hawaiʻi,[1] of excessive speeding
in violation of Hawaii Revised Statutes (**HRS**) § 291C-105.[2]  The

---

[1]  The Honorable Bruce A. Larson presided.

[2]  HRS § 291C-105 (2007) provides, in relevant part:

> **Excessive speeding.**  (a) No person shall drive a motor
> vehicle at a speed exceeding:
>
>     . . . .

(continued...)

trial court entered a judgment of conviction on May 17, 2018. Weber appeals from the "Judgment and Notice of Entry of Judgment" (**Judgment**) filed on May 21, 2018. We hold that the trial court did not err when it: (1) overruled Weber's objections to preliminary questions that laid the foundation for admission of the radar measurement of the speed of Weber's vehicle, or (2) admitted the speed measurement into evidence. Thus, we affirm the Judgment.

## BACKGROUND

On August 3, 2017, Hawai'i County Police Department (**HCPD**) officer Kimo Keliipaakaua, using a Stalker DSR 2X radar device manufactured by Applied Concepts, Inc., determined that Weber was operating his vehicle on a public road at a speed of 86 miles per hour (**MPH**). Officer Keliipaakaua cited Weber for excessive speeding. Weber contested the citation. A trial was conducted on May 17, 2018. Officer Keliipaakaua was the only witness called. The trial court found Weber guilty. This appeal followed.

## DISCUSSION

Weber raises two points of error, contending that the trial court erred by: (1) allowing Officer Keliipaakaua to testify about the contents of radar training and device manuals over Weber's objections to hearsay[3] and best evidence,[4] and

---

[2] (...continued)
   (2) Eighty miles per hour or more irrespective of the applicable state or county speed limit.

[3] Rule 802, Hawaii Rules of Evidence, Chapter 626, Hawaii Revised Statutes (2016) (**HRE**) provides:

Hearsay is not admissible except as provided by these rules, or by other rules prescribed by the Hawaii supreme court, or by statute.

[4] HRE Rule 1002 (2016) provides, in relevant part:

To prove the content of a writing, . . . the original
             (continued...)

(2) allowing Officer Keliipaakaua to testify about the speed measurement displayed on his Stalker DSR 2X radar device.

## I.   Evidentiary Objections

The State asked Officer Keliipaakaua to describe certain contents of the manual that came with his Stalker DSR 2X radar.  Weber objected based on hearsay and the best evidence rule.  The court overruled the objections, and Officer Keliipaakaua responded.  The State asked Officer Keliipaakaua to describe certain contents of the manual he received from Applied Concepts, Inc., the manufacturer of the Stalker DSR 2X, when he attended the manufacturer's training class in 2015.  Weber objected based on hearsay and the best evidence rule.  The court overruled the objections, and Officer Keliipaakaua responded.

The purpose of the State's questions was to lay the foundation for admission of Officer Keliipaakaua's testimony about Weber's speed as indicated on the Stalker DSR 2X radar device.  To lay a foundation for the introduction of a speed measurement by a radar device, the State must demonstrate that: **(1)** the police officer who used the device was trained as required by the device manufacturer; and **(2)** the device's accuracy was tested according to manufacturer-recommended procedures and was operating properly prior to use.  See State v. Gonzalez, 128 Hawai'i 314, 324-27, 288 P.3d 788, 798-801 (2012). As to the training prong, the State must show **(a)** what the manufacturer's training requirements were, and **(b)** what training was actually received by the police officer operating the device. See State v. Amiral, 132 Hawai'i 170, 178, 319 P.3d 1178, 1186 (2014) (citing Gonzalez, 128 Hawai'i at 327, 288 P.3d at 801). The Hawaii Rules of Evidence (**HRE**) do not apply to preliminary questions concerning the foundation for admissibility of a radar

---

⁴      (...continued)
writing[] . . . is required, except as otherwise provided in these rules or by statute.

speed measurement. HRE Rule 104(a);[5] HRE Rule 1101(d)(1)[6]. The trial court did not err in overruling Weber's objections.

## II.   Foundation for Radar Speed Measurement

"The determination of whether proper foundation has been established lies within the discretion of the trial court, and its determination will not be overturned absent a showing of clear abuse." Gonzalez, 128 Hawai'i at 325, 288 P.3d at 799 (cleaned up) (quoting State v. Assaye, 121 Hawai'i 204, 210, 216 P.3d 1227, 1233 (2009)).

### A.   Weber waived any objection to training.

In his closing argument Weber conceded that Officer Keliipaakaua was properly trained to operate his Stalker DSR 2X radar.[7] He waived any challenge to the training prong. See Gonzalez, 128 Hawai'i at 317, 288 P.3d at 791 (noting that

---

[5]   HRE Rule 104(a) (2016) provides, in relevant part:

Questions of admissibility generally. Preliminary questions concerning . . . the admissibility of evidence shall be determined by the court, subject to the provisions of subsection (b) [concerning relevancy conditioned on fact]. In making its determination the court is not bound by the rules of evidence except those with respect to privileges.

[6]   HRE Rule 1101(d)(1) (2016) provides:

(d)   Rules inapplicable. The rules (other than with respect to privileges) do not apply in the following:

(1)   Preliminary questions of fact. The determination of questions of fact preliminary to admissibility of evidence when the issue is to be determined by the court under rule 104.

[7]   In State v. Gleed, No. CAAP-16-0000373, 2017 WL 2839547 (Haw. App. June 30, 2017) (SDO) the majority held that the State failed to lay a sufficient foundation to establish that Officer Keliipaakaua was qualified to operate the radar device at issue in that case. Id. at *1. In a concurring opinion, Chief Judge Nakamura noted: "[W]hile proof that Officer Keliipaakau[a] had successfully completed training provided or conducted by a representative of the manufacturer would, in my view, have been sufficient to satisfy the qualified operator prong, the State did not present such evidence." Id. at *2 n.1 (Nakamura, C.J., concurring). In this case, the State presented evidence that Officer Keliipaakaua attended and passed the training conducted by the manufacturer's representatives.

4

failure to properly raise issue at trial level precludes party from raising that issue on appeal).

###### B. The State laid a proper foundation for accuracy of the radar device.

Officer Keliipaakaua testified that on the day he ticketed Weber, he tested and operated his assigned Stalker DSR 2X radar according to the contents of the manual that came with the device, the contents of the manual he received when he was trained by the manufacturer's representatives, and the actual training he received from the manufacturer.

He testified that he tests his radar before and after each shift to determine that it is operating properly. He first powers the device on and allows it to run an internal self-check. If it is running properly it emits four rapid tones; if something was wrong, the screen would read "fail" and the device would be inoperable.

The radar is operational once it passes the self-check. Officer Keliipaakaua then puts the device back into test mode using the remote control that comes with the device. This causes the device to run a second internal check. If the device is performing properly another four rapid tones would sound. He then performs an accuracy test using two tuning forks that come with the device. The forks are calibrated for 25 MPH and 40 MPH, and come with their own certificates of accuracy. He checks the target zones for the front and rear antennae. Each antenna has two target zones, for a total of four target zones: (1) vehicles traveling ahead of him in the same direction; (2) vehicles approaching him from the front; (3) vehicles approaching him from behind; and (4) vehicles behind him traveling away from him. He strikes a tuning fork on a non-metallic surface and it emits a frequency. He then holds the fork 2-6 inches away from an antenna. The device will display a speed. If the device is working properly, the displayed speed would be within 1 MPH of the speed to which the tuning fork was calibrated. He tests all

four of the device's target zones. Officer Keliipaakaua
testified that his Stalker DSR 2X radar tested properly before
and after his shift on the day he ticketed Weber.

### C.    The "calibration" issue.

Weber argues the State failed to establish that the
radar used by Officer Keliipaakaua was properly "calibrated."[8]
On voir dire, Weber asked Officer Keliipaakaua whether his radar
device was calibrated. Officer Keliipaakaua testified that the
device came with its own dated calibration certificate, and had
been calibrated in September 2012 (almost five years before
Weber's alleged offense). He was then asked to read aloud from
page 40 of the device's manual,[9] which the trial court allowed
over the State's objection. He read:

> So the heading is "Why Testing is Important."
>
> "In order to ensure continued compliance with FCC
> rules, meet legal requirements for admissibility of radar
> speed measurements, and verify full operating performance,
> the following test procedures are recommended. If the unit
> fails any of the -- the tests, it should be removed from
> service until the cause of the problem is corrected."
>
> Uh, next heading is gonna be "Periodic Calibration."
>
> "We recommend that the following performance
> characteristics should be verified on a regular basis.

---

[8]    The supreme court mentioned the "calibration" issue in Amiral, but
that case was decided based on the State's failure to lay foundation for the
officer's training, and the calibration issue was not reached. Amiral, 132
Hawai'i at 179, 319 P.3d at 1187. Amiral and Assaye both involved the use of
a Laser Technology Incorporated 20-20 UltraLyte laser gun by the Honolulu
Police Department, rather than the Applied Concepts, Inc. Stalker DSR 2X radar
used by the HCPD; it is not at all clear from the cases whether a laser gun
(which uses light waves) is "calibrated" in the same manner as a radar gun
(which uses radio frequency waves).

We did not reach the calibration issue in State v. Portillo,
No. CAAP-18-0000949, 2020 WL 1879621 (Haw. App. Apr. 15, 2020) (SDO)
(involving the Kaua'i Police Department's use of an unidentified radar gun)
because it had been waived. Id. at *2.

[9]    The manual shown to Officer Keliipaakaua was the one he brought
with him to court. It came with the Stalker DSR 2X he was issued in October
2017, after he cited Weber. He explained that the manual "[s]tays with the
unit[,]" but because his new radar was the same model as his old radar, the
manuals had the same content.

"No. 1.   Transmitter frequency is within specification of licensed operating frequency.

"No. 2.   Unit indicates correct speed, plus or minus one mile per hour, when reading a target of known speed.

"No. 3.   Unit detects target of good reflectivity over unobstructed flat terrain at distances of half a mile or more when set for highest sensitivity, sensitivity 4."

Officer Keliipaakaua testified that he does not "calibrate" the device, and that the device's manual does not provide user instructions for "calibrating" the device.   He agreed that "calibration goes towards the internal circuitry of the Stalker DSR 2X, as well as setting the frequency levels[.]"   He explained:

Q. Officer, when is it appropriate to send that device for calibration?

A. So basically there's -- there's two things that, uh, when I took the class, that was a big question that we asked, uh, the instructors is, "When -- How often do we need to calibrate the device", 'cause, again, it was a big thing, talking about calibration versus accuracy tests, and their answer is there's a difference between recommendation and requirements.

So in -- in this manual and in the passage you were just read, there were recommendations, meaning, and coming from the instructors, they recommend that the -- the unit be, um, calibrated every three years.   When does it have to be, when is it required to be calibrated, is whenever you have problems with it, as it said in the manual.   Whenever it says "Fail" and you're unable to remedy the -- remedy the problem, then you have to send it back in, that is the requirement, to have it recalibrated; but prior to that, *if you do the accuracy test and it's within the plus or minus one using the tuning forks, 'cause, again, each tuning fork is calibrated and it comes with its certificate of accuracy, as long as it's reading true to that or within that variance of plus or minus one, that the -- the device is working properly, then there will be no need for recalibration.*   And that's coming from the instructors.

Q. Then the other question is, is the language on page 40 of the manual, that you read, list [sic] three different items.

A. Yes.

Q. One is the aspect of the quarter mile, um, testing; the other one is the, uh, testing of the device within plus or minus one; and the other one is something to do with FCC, uh, frequency.

A. Yes.

7

Q. Is that part of calibration or part of accuracy testing?

A. So the first one is part of calibration, and *that's talking about the transmitting frequency, that's the -- within regulation of the FCC.* So that information is on the certificate of accuracy, or another [sic] words that calibration certificate, it says on there that it meets, um, the -- the FCC, uh, regulations as in -- as in accordance with them. So all that information is contained on that accuracy of -- uh, certificate of accuracy, which is the same thing as a calibration certificate. So they're the ones that, um, do that calibration to the frequency. It's already been completed. Again, there's nowhere in the manual that teaches me how to do that, or the user how to do that, as well as the cal -- calibration itself.

The second part is talking about the tuning forks. That is the only known speed because *each tuning fork has been calibrated to a specific, uh, frequency which gives off a certain miles per hour* and the variances between plus or minus one of -- of that frequency.

And then the last part is just when you use the device, is it picking up vehicles or are you able to measure vehicles at a certain distance?

That's the three -- three requirements that I just said in there, and again, these are recommendations.

(Emphasis added.)

Weber cites <u>State v. Manewa</u>, 115 Hawaiʻi 343, 167 P.3d 336 (2007), in support of his argument that the State failed to show that the radar was properly "calibrated." The defendant in <u>Manewa</u> was charged with promoting methamphetamine. The State was required to prove that the defendant possessed 1/8 ounce or more of methamphetamine. The State relied on the testimony of a Honolulu Police Department chemist **(Mohammed)**. Mohammed testified that he used an "analytical balance" to determine the weight of the substance he determined to be methamphetamine. He had been using the device for 25 to 30 years, and was "trained on how to use it and to operate it." <u>Id.</u> at 346, 167 P.3d at 339 (emphasis omitted). However, when asked whether he knew if there were "any procedures or . . . any protocol to determine whether or not your balance is operating properly[]" he responded, "We have a manufacturer representative who checks out and services the balance two times a year[.]" <u>Id.</u> (emphasis omitted). Mohammed did not check the balance before each individual test he

8

performed during the normal course of business.  The defendant argued that the State failed to lay foundation for Mohammed's testimony about the weight of the substance.

The Manewa court agreed, citing State v. Wallace, 80 Hawaiʻi 382, 910 P.2d 695 (1996).  As explained by the Manewa court, Wallace held that the State failed to establish the accuracy of an electric balance used to weigh cocaine found in the defendant's car.  In that case, a forensic chemist (**Chinn**) testified about the weight of the cocaine.  Chinn "had personal knowledge that the electronic balance was calibrated annually, [but] he lacked personal knowledge that the balance had been correctly calibrated and merely assumed that the manufacturer's service representative had done so."  Manewa, 115 Hawaiʻi at 353, 167 P.3d at 346 (cleaned up) (citing Wallace, 80 Hawaiʻi at 412, 910 P.2d at 725).  In Manewa the supreme court noted that "the service representative [in Wallace] did not testify at trial regarding his calibration of the balance" and "the prosecution . . . did not offer any business record of the manufacturer reflecting proper calibration of the balance."  Id. (cleaned up). The supreme court had concluded in Wallace that "because inadequate foundation was laid to show that the weight measured by the balance could be relied on as a substantive fact, [Chinn's] assumption that the balance was accurate was based on inadmissible hearsay."  Id. (cleaned up).  Applying Wallace to the facts of Manewa, the supreme court noted: "Like forensic chemist Chinn in Wallace, Mohammed 'had personal knowledge that the electronic balance was calibrated [semi-]annually.'  However, as in Wallace, there was no evidence that Mohammed had personal knowledge that the balance had been correctly calibrated." Manewa, 115 Hawaiʻi at 355, 167 P.3d at 348 (alteration in original) (citation omitted).

Manewa and Wallace are both distinguishable on their facts.  "Calibrate" means "to measure against a standard[.]"  Calibrate, Merriam-Webster, https://www.merriam-webster.com/dictionary/calibrate (last updated June 2, 2020).  In Manewa and Wallace there was no evidence that Mohammed or Chinn measured the accuracy of their respective balances against a standard by, for example, weighing objects of a certified weight before or after weighing the evidence at issue in those cases.  In State v. Tailo, 70 Haw. 580, 779 P.2d 11 (1989), the supreme court approved the use of tuning forks as calibration standards for radar guns:

> *A special tuning fork can be used to check the calibration of the radar gun.*  The tuning fork is specially tuned to vibrate at a frequency equal to the Doppler frequency for some set speed stamped into the handle of the fork.  To test the accuracy of the radar gun with the fork, the officer strikes the fork to get it vibrating and then holds the fork in front of the radar head.  The radar unit will then read the fork's vibration and display the read Doppler frequency value for comparison by the officer with the imprinted value on the fork. . . .
>
> . . . .
>
> . . . [W]e hold that *once the State puts in evidence that the police conducted a tuning fork test indicating the [radar] gun was properly calibrated, this evidence creates a prima facie presumption that the tuning fork itself was accurately calibrated.*

Id. at 583, 779 P.2d at 13-14 (emphasis added).  In this case Officer Keliipaakaua testified that he measured his radar device's accuracy against a standard — two calibrated, certified tuning forks that came with the device.  Weber produced no evidence to rebut the prima facie presumption that the tuning forks were accurately calibrated.  Although Officer Keliipaakaua did not use the words "calibrate" or "calibrated" to describe his Stalker DSR 2X radar, his testimony established that he in fact verified that his Stalker DSR 2X radar was "calibrated" to accurately measure the speed of Weber's vehicle.  The State satisfied the foundational requirements for admitting Officer Keliipaakaua's radar measurement of the speed of Weber's vehicle

into evidence under <u>Gonzales</u>, 128 Hawai'i at 324-27, 288 P.3d at 798-801, and <u>Tailo</u>, 70 Haw. at 583, 779 P.2d at 13-14.

## CONCLUSION

Based upon the foregoing, we hold that the trial court did not abuse its discretion by admitting Officer Keliipaakaua's radar measurement of the speed of Weber's vehicle into evidence. Accordingly, the "Judgment and Notice of Entry of Judgment" filed on May 21, 2018, is affirmed.

On the briefs:

E. Britt Bailey,
for Plaintiff-Appellee.

Daria K. Lagmay,
for Defendant-Appellant.

/s/ Lisa M. Ginoza

/s/ Derrick H.M. Chan

/s/ Keith K. Hiraoka

11